**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| ROY L. PERRY-BEY, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil No. 1:23-cv-01165-LMB-IDD |
| ) | |
| DONALD JOHN TRUMP, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

**<u>MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>**

**INTRODUCTION**

It is a "'fundamental principle of our representative democracy,' embodied in the Constitution, that 'the people should choose whom they please to govern them.'" *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 783 (1995) (quoting *Powell v. McCormack*, 395 U.S. 486, 547 (1969)). In a rambling Amended Complaint for Declaratory Judgment and Injunctive Relief ("Complaint") (ECF No. 10), Plaintiffs seek to deny the people the right to choose the next President of the United States by seeking declaratory and injunctive relief under Section 3 of the Fourteenth Amendment and Section 2 of the Voting Rights Act to prevent the leading Republican candidate, Defendant Donald John Trump ("President Trump"),[1] from appearing on the ballot for the Republican presidential primary in Virginia or for any future election.

Plaintiffs have failed to properly serve President Trump. Moreover, Plaintiffs lack standing to bring their claims, their claims present nonjusticiable political questions, and at no point in their Complaint do they allege facts sufficient to state a claim. Accordingly, President Trump moves to dismiss Plaintiffs' Complaint with prejudice under Federal Rules of Civil Procedure 12(b)(1), 12(b)(5), and 12(b)(6).

**ARGUMENT**

**I.      Plaintiffs Lack Standing**

Plaintiff's Complaint is little more than a request for an advisory opinion. "Article III constitutional standing includes three elements: 'First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest that is (a) concrete and particularized, and (b)

---

[1] *See generally 2024 Republican Presidential Nomination*, RealClearPolitics (last accessed October                                          24,                                          2023), https://www.realclearpolitics.com/epolls/2024/president/us/2024_republican_presidential_nomination-7548.html (showing President Trump with an average lead of 46.5 percent over the nearest competitor for the Republican nomination).

actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be addressed by a favorable decision.'" *Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 348, 361 (E.D. Va. 2009) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Plaintiffs fail all three requirements.

First, Plaintiffs lack an injury in fact.  "The Supreme Court has repeatedly refused to recognize generalized grievances against alleged illegal government conduct as sufficient to establish federal jurisdiction." *Perry-Bey*, 678 F. Supp. 2d at 361; *see also Lujan*, 504 U.S. at 573–74 ("[A] plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.").

Consistent with Supreme Court holdings regarding the insufficiency of generalized grievances, courts have widely held that individual voters lack standing to challenge the qualifications of presidential candidates.[2]  For example, in affirming the dismissal of a claim

---

[2] *See, e.g.*, *Hollander v. McCain*, 566 F. Supp. 2d 63, 71 (D.N.H. 2008), *Cohen v. Obama*, Civil Action No. 08 2150, 2008 WL 5191864, at *1 (D.D.C., Dec. 11, 2008); *Berg v. Obama*, 586 F.3d 234, 239 (3d Cir. 2009); *Barnett v. Obama*, No. SACV 09-0082 DOC (ANx), 2009 WL 3861788, at *8 (C.D. Cal. Oct. 29, 2009), *order clarified*, No. SA CV 09-0082 DOC (ANx), 2009 WL 8557250 (C.D. Cal. Dec. 16, 2009), and *aff'd sub nom. Drake v. Obama*, 664 F.3d 774 (9th Cir. 2011); *Kerchner v. Obama*, 612 F.3d 204, 207 (3d Cir. 2010); *Drake v. Obama*, 664 F.3d 774, 781–782 (9th Cir. 2011); *Sibley v. Obama*, 866 F. Supp. 2d 17, 20 (D.D.C. 2012); *Grinols v. Electoral Coll.*, No. 2:12-CV-02997-MCE-DAD, 2013 WL 2294885, at *10 (E.D. Cal. May 23, 2013), *aff'd*, 622 F. App'x 624 (9th Cir. 2015); and *Taitz v. Democrat Party of Mississippi*, No. 3:12-CV-280-HTW-LRA, 2015 WL 11017373, at *20 (S.D. Miss. Mar. 31, 2015); *Const. Ass'n Inc. by Rombach v. Harris*, No. 20-CV-2379 TWR (BLM), 2021 WL 4442870, at *2 (S.D. Cal. Sept. 28, 2021), *aff'd*, No. 21-56287, 2023 WL 418639 (9th Cir. Jan. 26, 2023); *Booth v. Cruz*, No. 15-CV-518-PB, 2016 WL 403153, at *2 (D.N.H. Jan. 20, 2016), *report and recommendation adopted*, 2016 WL 409698 (D.N.H. Feb. 2, 2016); *Fischer v. Cruz*, No. 16-CV-1224, 2016 WL 1383493, at *2 (E.D.N.Y. Apr. 7, 2016).

challenging President Obama's qualifications for office, the Third Circuit held that "a candidate's ineligibility . . . does not result in an injury in fact to voters." *Berg v. Obama*, 586 F.3d 234, 239 (3d Cir. 2009) ("[E]ven if . . . the placement of an ineligible candidate on the presidential ballot harmed [plaintiff]], that injury . . . was too general for the purposes of Article III [because plaintiff] shared . . . his interest in the proper application of the Constitution . . . with all voters."). When another set of challengers sought to differentiate themselves from the voting public by relying on their status as former service members of the Armed Forces and the National Guard, the Third Circuit affirmed dismissal for lack of standing. *Kerchner v. Obama*, 612 F.3d 204, 208 (3d Cir. 2010) ("Carving out an exception on that basis would still leave an impermissibly large class with unique ability to sue in federal court."); *see also Hollander v. McCain*, 566 F. Supp. 2d 63, 68 (D.N.H. 2008) ("[V]oters are empowered to address that concern on their own by voting for a different presidential candidate, whose eligibility is unimpeachable."); *Robinson v. Bowen*, 567 F. Supp. 2d 1144, 1146 (N.D. Cal. 2008) (finding plaintiff lacked standing in an eligibility challenge because "[n]either [he] nor general election voters" were "in any way prevented from supporting their preferred candidate").

Indeed, the United States District Court for the Southern District of California ruled as recently as mid-October that a plaintiff challenging President Trump's candidacy lacked standing to seek a declaratory judgment regarding President Trump's qualifications under Section Three, stating that a plaintiff "'seeking relief that no more and tangibly benefits him than it does the public at large' does not have Article III standing." *Schaefer v. United States of America, et al.*, No. 23-cv-1451-JLS (BLM), 2023 WL 6798507, at *2 (S.D. Cal. Oct. 13, 2023) (quoting *Lujan*, 504 U.S. at 573–74).

Plaintiffs' Complaint presents nothing more than a "generalized grievance."  Plaintiffs' claim to be registered voters in the Commonwealth of Virginia.  Compl. at ¶¶ 3–4.  There are millions of registered voters in Virginia.  Plaintiffs have no more of a claim of injury than any of the other registered voters.  This is not sufficient to establish standing.

Similarly, while Plaintiffs recite the elements of a claim under Section 2 of the Voting Rights Act, asserting "they are being denied the right to participate equally in elections and elect representatives of their choice based on their race or the color" by virtue of President Trump appearing on the ballot in Virginia, they allege *no* facts to support this assertion.  Indeed, they identify *no* means by which they (or anyone else) are affected by President Trump's appearance on the ballot.  Thus, Plaintiffs have not even made a cursory assertion of injury in fact, let alone a plausible one that rises above being "conjectural" or "hypothetical."

Second, and similarly, Plaintiffs fail to allege an injury that is traceable to President Trump.  Plaintiffs claim that "their right to vote has been abridged on account of their race or color."  Compl. at ¶ 1.  But Plaintiffs identify *no* causal mechanism that links this purported injury to President Trump's presence on the ballot.  Plaintiffs can vote for whichever candidate they would like, whether or not President Trump is on the ballot. Even if there were an injury (there is not), it is not in any way traceable to President Trump's inclusion on the ballot.

Finally, Plaintiffs' purported injuries are not redressable by the relief sought.  Plaintiffs do not identify what would be different if President Trump were not on the ballot.  They provide *no* explanation for how President Trump's presence on the ballot harms them or how they would be more likely to elect a candidate of their choice if President Trump were not on the ballot.

Plaintiffs have no standing to bring either their purported Section 3 claim or their Section 2 claim.  Accordingly, their Complaint should be dismissed.

## II.        Plaintiffs' Claims Present a Nonjusticiable Political Question

The Constitution commits exclusive power to determine presidential qualifications to Congress and the Electoral College. Federal and state courts presented with similar challenges to the qualifications of presidential candidates overwhelmingly indicated that they present nonjusticiable political questions. This Court should do likewise.

Political questions are nonjusticiable and, therefore, not cases or controversies. *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007). The United States Supreme Court set out broad categories that should be considered nonjusticiable political questions in *Baker v. Carr*, 369 U.S. 186, 217 (1962):

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] an unusual need for unquestioning adherence to a political decision already made; [and 6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

There is a textually demonstrable constitutional commitment to Congress to resolve questions regarding presidential qualifications. The Constitution expressly provides that:

> [I]f the President elect shall have failed to qualify, then the Vice President elect shall act as President until a President shall have qualified … and the Congress may by law provide for the case wherein neither a President elect nor a vice President elect shall have qualified, declaring who shall then act as President, or the manner in which one who is to act shall be selected, and such person shall act accordingly until a President or Vice President shall have qualified.

U.S. Const. amend. XX. Similarly, both Article II and the Twelfth Amendment prescribe a role for *Congress* in Presidential elections. U.S. CONST. art. II, cl. 3; *Id.* at amend. XII. And even Section Three of the Fourteenth Amendment embodies a clear textual commitment of authority to

*Congress*, giving it the power to lift any "disability" under Section Three. U.S. CONST. amend. XIV, § 3.

Were this Court to prevent former President Trump from appearing on the ballot, it would interfere with this mechanism. Responsibility for the enforcement of Section Three is vested by the Constitution in Congress—and *only* in Congress. This case, therefore, presents a nonjusticiable political question.

Unsurprisingly, numerous federal courts have indicated that similar challenges to the qualifications of presidential candidates (like Barack Obama and John McCain) present nonjusticiable political questions. The Third Circuit observed that a challenge to the qualifications of then-candidate Obama (based on his nationality) "seemed to present a non-justiciable political question.". *See Berg*, 586 F.3d at 238. Multiple district courts[3] and state courts[4] noted similar

---

[3] See *Grinols v. Electoral College*, No. 2:12–cv–02997–MCE–DAD, 2013 WL 2294885, at *6 (E.D. Cal. May 23, 2013) (dismissing a challenge to President Obama's qualifications for office, stating "the Constitution assigns to Congress, and not to federal courts, the responsibility of determining whether a person is qualified to serve as President of the United States. As such, the question presented by Plaintiffs in this case—whether President Obama may legitimately run for office and serve as President—is a political question that the Court may not answer."); *Taitz v. Democrat Party of Mississippi*, No. 3:12-CV-280-HTW-LRA, 2015 WL 11017373 (S.D. Miss. Mar. 31, 2015) (noting the presidential electoral and qualification process "are entrusted to the care of the United States Congress, not this court" and that the disqualification claims were therefore nonjusticiable); *Robinson v. Bowen*, 567 F. Supp. 2d 1144, 1147 (N.D. Cal. 2008) ("It is clear that mechanisms exist under the Twelfth Amendment and 3 U.S.C. § 15 for any challenge to any candidate to be ventilated when electoral votes are counted, and that the Twentieth Amendment provides guidance regarding how to proceed if a president elect shall have failed to qualify. Issues regarding qualifications for president are quintessentially suited to the foregoing process. Arguments concerning qualifications or lack thereof can be laid before the voting public before the election and, once the election is over, can be raised as objections as the electoral votes are counted in Congress. The members of the Senate and the House of Representatives are well qualified to adjudicate any objections to ballots for allegedly unqualified candidates. Therefore, this order holds that the challenge presented by plaintiff is committed under the Constitution to the electors and the legislative branch, at least in the first instance. Judicial review—if any—should occur only after the electoral and Congressional processes have run their course.").

[4] *See, e.g.*, *Strunk v. New York State Bd. Of Elections*, No. 6500/11, 2012 WL 1205117, *11 (Sup. Ct. Kings Cnty. N.Y. Apr. 11, 2012) ("Plaintiff's complaint essentially challenges the

concerns Presidential qualifications are nonjusticiable political questions that this Court lacks jurisdiction to adjudicate.

### III.    Plaintiff's Complaint Fails to State a Claim

"While a pro se litigant's pleadings are liberally construed . . . a pro se complaint must still contain sufficient facts 'to raise a right to relief above the speculative level' and 'state a claim to relief that is plausible on its face.'" *Clark v. Smith*, No. 22-6958, 2023 WL 4198038, at *2 (4th Cir. June 27, 2023) (per curium) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requires more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" nor will "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Bell Atl. Corp.*, 550 U.S. at 555, 557). Moreover, "the court need not accept the legal conclusions drawn from the facts, and need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Thweatt v. Rhodes*, No. 21-1242, 2023 WL 4231724, at *3 (4th Cir. June 28, 2023) (quoting *Monroe v. City*

---

qualifications of both President OBAMA and Senator McCAIN to hold the office of President. This is a non-justiciable political question. Thus, it requires the dismissal of the instant complaint."); *Keyes v. Bowen*, 189 Cal. App. 4th 647, 660 (2010) ("[R]equir[ing] each state's election official to investigate and determine whether the proffered candidate met eligibility criteria of the United States Constitution, giving each the power to override a party's selection of a presidential candidate" would be a "truly absurd result" because "[w]ere the courts of 50 states at liberty to issue injunctions restricting certification of duly-elected presidential electors, the result could be conflicting rulings and delayed transition of power in derogation of statutory and constitutional deadlines." Accordingly, "[a]ny investigation of eligibility is best left to each party, which presumably will conduct the appropriate background check or risk that its nominee's election will be derailed by an objection in Congress, which is authorized to entertain and resolve the validity of objections following the submission of the electoral votes."); *Jordan v. Secretary of State Sam Reed,* No. 12-2-01763-5, 2012 WL 4739216, at *1 (Wash. Super. Aug. 29, 2012) ("I conclude that this court lacks subject matter jurisdiction. The primacy of congress to resolve issues of a candidate's qualifications to serve as president is established in the U.S. Constitution.").

*of Charlottesville, Va.*, 579 F.3d 380, 385–86 (4th Cir. 2009)). Plaintiffs' allegations fail these standards.

### A. Plaintiffs' Section 2 Claim is "An Unadorned, the Defendant-Unlawfully-Harmed-Me Accusation"

As a preliminary matter, this section assumes *arguendo* that there is an implied private right of action under Section 2 of the Voting Rights Act.  As Justice Gorsuch noted (joined by Justice Thomas) in his concurrence in *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2350 (U.S. 2021) (Gorsuch, J., concurring), both the Supreme Court and the courts of appeal—including the Fourth Circuit—have treated this as an open question.  *Id.,* citing *Washington v. Finlay*, 664 F.2d 913, 926 (4th Cir. 1981).  Defendant reserves the right to address this issue at a later date, should it prove necessary to do so.

Plaintiffs claim "they are being denied the right to participate equally in the elections and elect representatives of their choice based on race or color" due to the potential presence of President Trump on the primary ballot, Compl. at ¶ 1, that they "are members of a minority group and that their right to vote has been abridged on account of their race or color," Compl. at ¶ 5, and that President Trump appearing on the ballot "unlawfully deprives Petitioners African American citizens right to participate equally in elections and elect candidates of their choice," Compl. at ¶ 50.

At no point do Plaintiffs allege, let alone *plausibly* allege, how they are being denied the right to participate equally in the election.  At no point do they allege how they are unable to elect the candidate of their choice.  At no point do they allege how their race is relevant to anything, let alone how they are being denied the right to participate in the election *because* of their race.  Even assuming *arguendo* that the potential inclusion of President Trump on the primary ballot could constitute a "standard, practice, or procedure imposed or applied by the State," 52 U.S.C. §

10301,—itself at best a debatable proposition—Plaintiffs' Section 2 claim is *at best* a "naked assertion devoid of further factual enhancement." As such, it is insufficient to state a claim and should be dismissed.

### B. Plaintiffs Fail to State a Claim Under Section Three of the Fourteenth Amendment

Plaintiffs also fail to state a claim under Section Three of the Fourteenth Amendment. First, Section Three is not self-executing. Thus, there is no applicable cause of action. Second, neither the State Board of Elections nor the State Department of Elections has statutory authority to disqualify a candidate based on constitutional qualifications. Third, Section Three's disqualification provisions do not apply to the President. And fourth, the alleged conduct does not meet the standard for disqualification under Section Three.

### i. The Fourteenth Amendment Is Not Self-Executing and There Is No Operative Authorizing Statute

Section Three of the Fourteenth Amendment is not self-executing and, therefore, cannot support a cause of action absent an authorizing statute. *See, e.g.*, *Rosberg v. Johnson*, No. 8:22CV384, 2023 WL 3600895, at *3 (D. Neb. May 23, 2023); *Secor v. Oklahoma*, No. 16-CV-85-JED-PJC, 2016 WL 6156316, at *4 (N.D. OK Oct. 21, 2016). There is no operative authorizing statute that allows the State Board of Elections, Department of Elections, or individual voters to strike a presidential candidate from appearing on a ballot.

Textually, Section Five of the Fourteenth Amendment expressly states that "Congress shall have the power to enforce, by appropriate legislation, the provisions of this article." U.S. CONST. amend. XIV, § 5; *see also Hansen v. Finchem*, No. CV-22-0099-AP/EL, 2022 WL 1468157, at *1 (Ariz. May 9, 2022) ("Section 5 of the Fourteenth Amendment appears to expressly delegate to Congress the authority to devise the method to enforce the Disqualification Clause."); *see also*, *e.g. Ownbey v. Morgan*, 256 U.S. 94, 112 (1921) ("[I]t cannot rightly be said that the Fourteenth

Amendment furnishes a universal and self-executing remedy."). There is no current enforcement legislation for Section Three.

The practical history of Section Three confirms that enforcement legislation was necessary. One year after ratification, Chief Justice Salmon P. Chase, riding circuit, ruled Section Three was not self-executing and could only be enforced through specific procedures prescribed by Congress or the Constitution. *In re Griffin*, 11 F.Cas. 7 (C.C.Va 1869).[5] Chief Justice Chase reasoned that a different conclusion would have created an immediate and intractable national crisis.

Congress then passed a law—entitled the "Enforcement Act"—that provided federal district attorneys (but not state election officials) authority to enforce Section Three by seeking writs of *quo warranto* from federal courts to remove from office people who were disqualified by Section Three. Federal prosecutors immediately started exercising *quo warranto* authority, bringing charges against many rebel leaders. These actions waned after a few years, and the Amnesty Act of 1898 completely removed all Section Three disabilities incurred to that date. *See* Amnesty Act of 1872 (removing most disqualifications in the manner provided by Section Three); Pres. Grant Proclamation 208 (suspending *quo warranto* prosecutions).

There is no current operative authorization statute. The Enforcement Act was codified as 13 Judiciary ch. 3, sec. 563 and later recodified into 28 Judicial Code 41 — but in 1948, Congress

---

[5] The Chief Justices' conclusion is reinforced by legislative history.  During Congressional debate on Section Three, Congressman Thaddeus Stevens twice announced that this section needed enabling legislation. Cong. Globe, 39th Cong. 1st Sess.2544; Cong. Globe, 39th Cong. 1st Sess.3149. Similarly, during the ratification debates Thomas Chalfant argued that the only way rebel leaders would have a fair trial would be if "under the fifth section of this amendment … by appropriate legislation, for enforcing this amendment …. I can conceive of nothing, unless it be some act authorizing the appointment of a commission to prescribe qualifications and investigate claims of all candidates and candidates for office. This would be one way." Hon. Thos. Chalfant, member from Columbia Country, in the House, January 30, 1867, on Senate Bill No. 3, in the Appendix to the Daily Legislative Record Containing the Debates on the Several Important Bills Before the Legislature of 1867 (George Bergner, ed.) (Harrisburg 1867). Lash 39–40.

repealed 28 U.S.C. 41 in its entirety. *See* Act of June 25, 1948, ch. 646, § 39, 62 Stat. 869, 993; Act of June 25, 1948, ch. 645, § 2383, 62 Stat. 683, 808. In 2021, legislation was once again introduced in Congress to create a cause of action to remove individuals from office who engaged in insurrection or rebellion, but Congress refused to pass the bill. *See* H.R. 1405, 117th Cong. (2021). Thus, there exists no current private right of action that allows voters the right to enforce Section Three against any presidential candidate.

Philosophically, this makes sense.  A recent article by scholars Joshua Blackman and Seth Barrett Tillman summarizes the question of whether Section Three is self-executing by drawing a distinction between the *offensive* use of constitutional provisions to support an affirmative cause of action and the defensive use of constitutional provisions, concluding, "Constitutional provisions are not automatically self-executing when used offensively by an applicant seeking affirmative relief. Nor is there any presumption that constitutional provisions are self-executing." Josh Blackman & Seth Barrett Tillman, *Sweeping and Forcing the President into Section 3*, 28 Tex. Rev. L. & Pol. (forth. circa Mar. 2024) (manuscript at 19) (available at SSRN: https://ssrn.com/abstract=4568771)..

It also makes practical sense for Congress to decline to establish a system in which each state or court system, applying differing standards and reaching potentially conflicting results, could throw a presidential election into chaos.

Section Three is not self-executing.  It cannot be wielded as an offensive weapon without authorizing legislation.  And there is no operative authorizing legislation today.  Thus, Plaintiffs fail to state a claim, and their complaint must be dismissed.

### ii.     The Department of Elections and State Board of Elections Have No Authority to Assess Presidential Qualifications

Plaintiffs demand that the Department of Elections and the State Board of Elections decline to list President Trump on the Republican Party presidential primary ballot based on his alleged "disqualification" under Section Three.  But the Commonwealth has no duty to assess presidential qualifications and lacks the authority to keep President Trump off the ballot based on Section Three.

The State Board of Elections requires three forms to appear on a presidential primary ballot: a declaration of candidacy, a petition of qualified voters, and a petition statement.  *See* Virginia State Board of Elections, *How to Run for Office for Candidates and Party Representatives: Requirements for the March 5, 2024 Presidential Primary Election*, at 4 (May 30, 2023), https://www.elections.virginia.gov/media/candidatesandpacs/2024-president-candidate-and-party-docs/2024-Presidential-Primary-Candidate-and-Party-Bulletin_finaldraft-1.pdf. None of these forms ask whether a candidate meets the Article II qualifications, let alone any qualifications under Section Three.  *See* Exhibit A (Declaration of Candidacy); Exhibit B (Statement of Petition Signatures for Presidential Candidate); Exhibit C (Petition of Qualified Voters for Presidential Primary).

This makes sense because there is no statutory requirement to assess whether a candidate is qualified to serve as president.  Under the Virginia Code, "[a]ny person seeking the nomination of the national political party for the office of President of the United States . . . may file with the State Board petitions signed by at least 5,000 qualified voters, including at least 200 qualified voters from each congressional district in the Commonwealth" on a form provided by the State Board, with "a list of the names of persons who would be elected delegates and alternate delegates to the political party's national convention if the person wins the primary and the party has

determined that its delegates will be selected pursuant to the primary."  Va. Code § 24.2-545(B).
The State Board provides these materials to the relevant state party chairman, who "*shall*, by the
deadline set by the State Board, furnish to the State Board the names of all candidates who have
satisfied the requirements of this section."  *Id.*

 This is not an accidental omission.  Candidates for state and local office must submit a
Certificate of Candidate Qualification in order to appear on the ballot.  *See* Va. Code § 24.2-501
("It shall be a requirement of candidacy for any office of the Commonwealth, or of its
governmental units, that a person must file a written statement under oath, on a form prescribed
by the State Board, that he is qualified to vote for and hold the office for which he is a candidate.");
*see also* Exhibit D (Certificate of Candidate Qualification).  This makes sense because Virginia
law imposes additional statutory qualifications on candidates for state and local office.  Va. Code
§ 24.2-500.

 Drawing a distinction between state and local candidates and candidates for president
makes sense.  As discussed above, *see supra* at § II, assessing presidential qualifications is
constitutionally assigned to Congress. Electing the President of the United States is a federal
function. It arises under the Constitution as a consequence of the creation of the national
government. *U.S. Term Limits, Inc.*, 514 U.S. at 802 ("As Justice Story recognized, 'the states can
exercise no powers whatsoever, which exclusively spring out of the existence of the national
government, which the constitution does not delegate to them . . . . No state can say that it has
reserved, what it never possessed." (citation omitted)). While states are delegated some power to
impose procedural requirements, such as requiring candidates to "muster a preliminary showing
of support" before appearing on the ballot—*i.e.*, Virginia's petition requirement—they cannot add
new substantive requirements. *See Schaefer*, 215 F.3d at 1038.

13

The State Board of Elections and the Department of Elections have neither the duty nor the authority to assess a presidential candidate's constitutional qualifications; they cannot do what Plaintiff is asking them to do.  Accordingly, Plaintiff fails to state a claim.

### iii.   Section Three Does Not Apply to the President

Section Three does not apply to the President of the United States. By its plain terms, Section Three does not explicitly include the President.  Section Three specifically references several officials, including members of Congress and members of any State legislature.  It does not specifically mention the President.  Pursuant to the semantic canon of statutory interpretation *expressio unius est exclusio alterius*, the "expression of one thing implies the exclusion of others" not mentioned.  ANTONIN SCALIA & BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012).  Since the President is not mentioned, basic canons of statutory interpretation counsel that the President is not included within the scope of Section Three.

To avoid this conclusion, some have looked to the phrase "officers of the United States" as a catch-all to include the President.  This argument is unavailing.  The phrase "Officers of the United States," as used in the Constitution of 1788, does not refer to elected positions. *See* Josh Blackman & Seth Barrett Tillman, *Is the President an "Officer of the United States" for Purposes of Section 3 of the Fourteenth Amendment?*, 15(1) N.Y.U. J. L. & LIBERTY 1 (2021); Josh Blackman & Seth Barrett Tillman, *supra* page 15, at 185–86 (citing to the Impeachment Clause, the Appointments Clause, and the Commission Clause as textual support). This view is further supported by several recent Supreme Court decisions.  For example, *Free Enterprise Fund v. Public Company Accounting Oversight Board* observed that "[t]he people do not vote for the 'Officers of the United States.'" 561 U.S. 477, 497–98 (2010). Likewise, *Seila Law LLC v. CFPB* noted, "Article II distinguishes between two kinds of officers—principal officers (who must be appointed by the President with the advice and consent of the Senate) and inferior officers (whose

appointment Congress may vest in the President, courts, or heads of Departments).” 140 S.Ct. 2183, 2199 n.3 (2020).  Both categories of positions are appointed—not elected.

The history of how the Constitution’s Impeachment Clause was drafted further supports this conclusion. When the Impeachment Clause was drafted, it initially referred to the President, Vice President, and “other civil officers of the U.S.” 2 The Records of the Federal Convention of 1787, at 545 and 552 (Farrand ed., 1911). But, upon further deliberation, the drafters changed the Impeachment Clause to remove the word “other.” *Id.* at 600. There would have been no reason to do that if the President were indeed an “officer of the United States.”

In addition, even if this Court were to determine that President Trump was an “officer of the United States” (he is not), Section Three does not, by its terms, apply to *all* “officers of the United States.” It only applies to those who have taken “previously taken an oath . . . *to support* the Constitution of the United States.” U.S. Const. amend. XIV, § 3 (emphasis added). In general, members of the federal and state governments take an oath “to support this Constitution.” U.S. Const. art. VI, cl. 3.  But Presidents take a different oath that requires affirmation that the President “will to the best of my Ability, *preserve, protect and defend* the Constitution of the United States.” U.S. Const., art. II, cl. 8 (emphasis added).  Section Three uses the language of the Article VI oath—not the Article II oath.

This is significant for two reasons. First, it is further evidence that the President was not understood or intended by the drafters of the Fourteenth Amendment to be an Officer of the United States. And second, because having “previously taken an oath . . . to *support* the Constitution of the United States” is a further limitation upon the class of persons subject to Section Three, it excludes President Trump—who never took such an oath—from that class of persons.

If the Framers of the Constitution wanted the oath to be the same for the President of the United States as it is for senators, representatives, state legislators, and executive and judicial officers, they would have so stated. The words that they chose must be given their proper meaning, and where they chose different phrases, those phrases must be accorded different meanings. *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 334, 4 L. Ed. 97 (1816) ("From this difference of phraseology, perhaps, a difference of constitutional intention may, with propriety, be inferred. It is hardly to be presumed that the variation in the language could have been accidental."). Section Three does not apply to the President of the United States.

### iv.     The President Did Not Engage in an Insurrection

Plaintiffs have not alleged—apart from bare conclusions—that President Trump has violated any provision of Section Three.  Nor can they.  Assuming Plaintiffs' pleadings to be true and construing all reasonable inferences in the light most favorable to them, the Complaint on its face does not assert a cause of action.  This Court should thus dismiss this action for failure to state a claim upon which relief can be granted.

### a.     The January 6, 2023, Riot Does Not Constitute an "Insurrection" Under Section Three

Section Three was modeled partly on the original Constitution's Treason Clause and partly on the Second Confiscation Act, which Congress had enacted in 1862.  Section Two of the Confiscation Act punished anyone who "shall hereafter incite, set on foot, assist, or engage in any rebellion or insurrection against the authority of the United States … or give aid or comfort thereto."  12 Stat. 589 & 627 (1862); *see* 18 U.S.C. § 2383.

Section Three, ratified six years later with the rest of the Fourteenth Amendment, similarly covers "insurrection or rebellion."  Unlike the Confiscation Act, however, Section Three omits

any penalty for 'incit[ing] or "assist[ing]" an insurrection, and it penalizes only actually "engag[ing] in" insurrection. U.S. CONST. amend XIV, § 3.

The year after the Confiscation Act became law, Chief Justice Chase—an appointee of President Lincoln—construed these terms and held the Act prohibits only conduct that "amount[s] to treason within the meaning of the Constitution," not any lesser offense. *United States v. Greathouse*, 26 F. Cas. 18, 21 (C.C.N.D. Cal. 1863). Indeed, the Chief Justice concluded that not just any form of treason would do: he construed Section 2 of the Act to cover only treason that "consist[ed] in engaging in or assisting a rebellion or insurrection." *Id.* In the same case, another judge confirmed and clarified that, for these purposes, "engaging in a rebellion and giving it aid and comfort[] amounts to a levying of war" and that insurrection and treason involve "different penalt[ies]" but are "substantially the same." *Id.* at 25 (Hoffman, J.). Contemporary dictionaries confirmed this definition. John Bouvier's 1868 legal dictionary defined *insurrection* as a "rebellion of citizens or subjects of a country against its government" and *rebellion* as "taking up arms traitorously against the government."[6]

Congress's immediate post-ratification consideration of Section Three itself reflects the same understanding. In 1870—just two years after the Fourteenth Amendment was ratified—Congress considered whether a Representative-elect from Kentucky was disqualified by Section Three when, before the Civil War began, he had voted in the Kentucky legislature in favor of a resolution to "resist [any] invasion of the soil of the South at all hazards." CONG. GLOBE, 41st Cong., 2nd Sess. 5443 (1870). The House found that this was not disqualifying. *Id.* at 5447. Similarly, in 1870, the House also considered the qualifications of a Representative-elect from

---

[6] *A Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union* (Philadelphia, G.W. Childs, 12th ed., rev. and enl. 1868).

Case 1:23-cv-01165-LMB-IDD   Document 27   Filed 10/25/23   Page 19 of 30 PageID# 991

Virginia who, before the Civil War, had voted in the Virginia House of Delegates for a resolution that Virginia should "unite" with "the slaveholding states" if "efforts to reconcile" with the North should fail, and stated in debate that Virginia should "if necessary, fight," but who after Virginia's actual secession "had been an outspoken Union man." *Hinds' Precedents of the House of Representatives of the United States*, 477 (1907). The House found that this was not disqualifying under Section Three. *Id.* at 477–78. By contrast, the House did disqualify a candidate who "had acted as colonel in the rebel army" and "as governor of the rebel State of North Carolina." *Id.* at 481, 486.

The riot that occurred at the Capitol on January 6, 2021, was terrible. But it was not a war upon the United States. The January 6 rioters entered the Capitol, stayed inside for a few hours, and then left. Ultimately, Congress counted the electoral votes early the next morning. Not a single piece of evidence shows that the rioters made war on the United States or tried to overthrow the government. Plaintiffs cannot show not a single instance of anyone being shot by the rioters. Plaintiff cannot show a single instance of someone being stabbed by the rioters. The only people who died at the riot and because of the riot were protestors.[7]

Even if all the facts in the Complaint are true, rebellion or insurrection is a federal crime, and no court in the United States has found President Trump guilty of 18 U.S.C. § 2383. To the contrary, the Senate found President Trump not guilty of impeachment charges of insurrection brought by the 117th Congress. *See* Impeaching Donald John Trump, President of the United

---

[7] The sole police officer to die did so of natural causes—a stroke. Williams, Pete, "Capitol Police Officer Biran Sicknick died of natural causes after riot, medical examiner says," NBC News, April 19, 2021, https://www.nbcnews.com/politics/politics-news/capitol-police-officer-brian-sicknick-died-natural-causes-after-riot-n1264562, last visited October 6, 2023.

States, for high crimes and misdemeanors, H. 24, 117th Cong. (2021).[8] No court in the United

States has found President Trump guilty under 18 U.S.C. § 2383. Furthermore, notwithstanding

Plaintiff's erroneous claim to the contrary, *see* Compl. at ¶ 41, not a single prosecutor has filed an

indictment against President Trump for rebellion or insurrection, much less obtained a conviction

on such a charge.  Nor has a single prosecutor charged any of the 1,000+ people connected to the

riot at the Capitol under 18 U.S.C. § 2383, the federal criminal statute that covers "insurrection."

*United States v. Griffith*, Criminal Action No. 21-244-2 (CKK), 2023 WL 2043223, at *3 fn. 5

(D.D.C. Feb. 16, 2023), (finding that "no defendant has been charged with [18 U.S.C. § 2383]");

*See also*, Alan Feuer, *More Than 1,000 People Have Been Charged in Connection with the Jan. 6*

*Attack*, N.Y. TIMES (Aug. 1, 2023), https://www.nytimes.com/live/2023/08/01/us/trump-

indictment-jan-6#more-than-1000-people-have-been-charged-in-connection-with-the-jan-6-

attack.  The events of January 6 devolved into a riot that was repugnant to any objective observer.

But they were not an "insurrection."

### b.  "Aid or Comfort to the Enem[y]" Under Section Three Requires Assistance to a Foreign Power"

While the Complaint is not a model of clarity, Plaintiffs appear to conflate "engaging" in

an insurrection and providing "aid or comfort" to an enemy under Section 3.  *See* Compl. at ¶ 45.

This is incorrect.  The "aid or comfort" provision only applies to "enemies," which is limited to

hostile foreign powers.

The fifth clause of Section Three disqualifies those who have "given aid or comfort to the

enemies" of the "United States" or the "Constitution."  In this regard, Section Three was not

modeled on the Confiscation Act, which criminalized giving "aid or comfort" to a "rebellion or

---

[8] The Senate's not guilty vote can be found at https://www.senate.gov/legislative/LIS/roll_call_votes/vote1171/vote_117_1_00059.htm (last visited on October 6, 2023).

insurrection." Instead, Section Three replicates the language of the original Constitution's Treason Clause, Article III, Section Three, which defines treason as "adhering to [the United States'] Enemies, giving them Aid and Comfort."

The "enemies" prong of the Treason Clause almost exactly replicated a British statute defining treason. *See* 4 WILLIAM BLACKSTONE, COMMENTARIES *82. But "enemies," as used in that statute, referred only to "the subjects of foreign powers with whom we are at open war," not to "fellow subjects." *Id.* at 82–83. Blackstone was emphatic that "an enemy" was "always the subject of some foreign prince, and one who owes no allegiance to the crown of England." *Id.*

Blackstone's view was also the American view. Four years after the original Constitution was ratified, Justice Wilson explained that "enemies" are "the citizens or subjects of foreign princes or states, with whom the United States are at open war." 2 *Collected Works of James Wilson* 1355 (1791). The 1910 version of *Black's Law Dictionary* agrees, defining "enemy" as "either the nation which is at war with another, or a citizen or subject of such nation." BLACK'S LAW DICTIONARY (2d ed. 1910). At the outset of the Civil War, the Supreme Court had recognized that the Confederate states should be "treated as enemies," under a similar definition of that word, because of their "claim[] to be acknowledged by the world as a sovereign state," and because (although the United States did not recognize that claim) the Confederacy was *de facto* a foreign power that had "made war on" the United States. *See The Prize Cases*, 67 U.S. 635, 673–74 (1862). Thus, it made sense for Section Three, enacted in response to the Civil War, to refer to support for the Confederacy as "aid and comfort to… enemies," defined as foreign powers in a state of war with the United States. To be disqualified under Section Three, a person must have "engaged" in an insurrection, not merely provided aid or comfort.

**v. These Definitions Make Clear That President Trump's Alleged Conduct Does Not Come Within Section Three**

Even if January 6 was an insurrection (it was not), Plaintiffs fail to establish that President Trump "engaged" in insurrection. The Complaint itself is short on details for what exactly President Trump did that Plaintiffs believe constitutes "engaging" in insurrection. To the extent that Plaintiff cites specifics, Plaintiffs focus on President Trump's speech on the ellipse of the White House, later tweets, and purported inaction during the riot. *See* Compl. at ¶¶11–15. This is insufficient to state a claim.

The framers of the Fourteenth Amendment made a deliberate choice that Section Three should cover only actual "engage[ment] in" insurrection or rebellion (or assisting a foreign power), not advocating rebellion or insurrection. As noted above, Congress modeled Section Three partly on the original Constitution's Treason Clause and partly on the Second Confiscation Act (enacted in 1862). The Second Confiscation Act made it a crime to "incite, set on foot, assist, or engage in any rebellion or insurrection against the authority of the United States, or the laws thereof, or . . . give aid or comfort thereto, or . . . engage in, or give aid and comfort to, any such existing rebellion or insurrection." 12 Stat. 589, 627 (1862); *see* 18 U.S.C. § 2383. In other words, it drew distinctions between inciting, assisting, or giving aid or comfort on the one hand and engaging on the other. The plain implication is that they refer to separate and distinct concepts. *See* ANTONIN SCALIA & BRIAN A. GARNER, *supra* ("[A] material variation in terms suggests a variation in meaning.").

The word "engage" connotes active, affirmative involvement. To wit, Black's Law Dictionary defines "engage" to mean "employ or involve oneself; to take part in; to embark on." BLACK'S LAW DICTIONARY (11th ed. 2019). This suggests a significant level of activity, not mere words or inaction.

This textual analysis is supported by the historical context.  The same representatives who voted for the Fourteenth Amendment understood that, under its terms, even strident and explicit antebellum advocacy for a future rebellion was not "engaging in insurrection" or providing "aid or comfort to the enem[y]."  *See supra* § III(B)(iv)(a) (discussing the post-ratification history of Section Three). Plaintiffs' allegations fall well short of how Congress has understood and applied Section Three in practice.

Moreover, contrary to Plaintiffs' suggestion, President Trump's speech falls well short of "inciting" the riot.  *See* Compl. at ¶ 22.  "If the First Amendment protects flag burning, funeral protests, and Nazi parades—despite the profound offense such spectacles cause—it surely protects political campaign speech despite popular opposition." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014) (citing *Texas v. Johnson*, 491 U.S. 397 (1989); *Snyder v. Phelps*, 562 U.S. 443 (2011); *Nat'l Socialist Party of Am. v. Skokie*, 432 U.S. 43 (1977) (*per curiam*)). "Indeed, the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco City Democratic Cent. Comm*., 489 U.S. 214, 223 (1989). Speech on matters of public concern—even controversial or objectionable speech on matters of public concern—is protected by the First Amendment. *See, e.g.*, *Snyder*, 562 U.S. 443.

These basic principles apply, even in the context of Section 3.  For example, the Supreme Court considered the Georgia legislature's refusal to seat an elected candidate on the ground that his strident criticisms of the Vietnam War "gave aid and comfort to the enemies of the United States" and were inconsistent with an oath to support the Constitution. *Bond v. Floyd,* 385 U.S. 116, 118–23 (1966). The Court held that the candidate's speech was protected by the First Amendment and could not be grounds for disqualification. *Id.* at 133–37.

Even assuming *arguendo* that incitement could qualify as "engaging" under Section Three, speech must clear a very high First Amendment threshold to rise to the level of "incitement." Even "advocacy of the use of force or of law violation" or of "'the duty, necessity, or propriety' of violence" falls short of that threshold. *Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969). The "mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002); *Nwanguma v. Trump*, 903 F.3d 604, 610 (6th Cir. 2018). "What is required, to forfeit constitutional protection," is speech that (1) "specifically advocates for listeners to take unlawful action" and (2) is likely to produce "*imminent* disorder"—not merely "illegal action at some indefinite future time." *Nwanguma*, 903 F.3d at 610 (cleaned up); *Hess v. Indiana*, 414 U.S. 105, 108–09 (1973) (emphasis added). And, as the Court recently underscored in *Counterman v. Colorado*, it requires a showing of "specific intent . . . equivalent to purpose or knowledge." 600 U.S. 66, 81 (2023) (citing *Hess v. Indiana*, 414 U.S. 105, 109 (1973)).

Under the *Brandenburg* test, President Trump's comments did not come close to "incitement," let alone "engagement" in an insurrection. As the Sixth Circuit recognized, "the fact that audience members reacted by using force does not transform . . . protected speech into unprotected speech." *Nwanguma*, 903 F.3d at 610. And, as a D.C. Circuit judge remarked at argument last year, if "you just print out the [President's January 6] speech . . . and read the words … it doesn't look like it would satisfy the [*Brandenburg*] standard." Tr. of Argument at 64:5–7 (Katsas, J.), *Blassingame v. Trump*, No. 22-5069 (D.C. Cir. Dec. 7, 2022).

Plaintiffs have not directly alleged any statement attributed to former President Trump that implicitly or explicitly advocated for illegal conduct. President Trump's only explicit instructions called for protesting "peacefully and patriotically," to "support our Capitol Police and law

enforcement," to "[s]tay peaceful," and to "remain peaceful." *See The January 6th Report* 117th Cong. 586 (2022) (ECF No. 10-1) (Which records that President Trump ensured to tell the crowd at the Ellipse to protest "peacefully and patriotically"); @realDonaldTrump, Twitter (Jan. 6, 2021, 2:38 PM), https://twitter.com/realDonaldTrump/status/1346904110969315332; @realDonaldTrump, Twitter (Jan. 6, 2021, 3:31 PM), https://twitter.com/realDonaldTrump/status/1346912780700577792. Former President Trump's calls for peace and patriotism notwithstanding, the courts have made clear that angry rhetoric falls far short of an implicit call for lawbreaking.

Moreover, Plaintiffs' suggestion that President Trump "engaged" in an insurrection through his supposed inaction during the riot at the Capitol fails as a matter of textual interpretation and practical common sense. First, as described above, the word "engage" connects active, affirmative involvement.  It does not and cannot mean inaction.

Second, there is no manageable standard for assessing Presidential inaction.  Plaintiffs allege that President Trump failed to act for "several hours."  Compl. at ¶ 16. Without direct evidence, they attribute this inaction to malice.  But they do not and cannot provide a standard for what period of action or inaction would be acceptable. Instead, Plaintiffs' insinuation is an invitation to turn every policy dispute about the use of force (or lack thereof) into a Section Three debate that would have broad implications for the exercise of the power of the Presidency, particularly in foreign affairs. For example, President Obama and then-Secretary Clinton were famously criticized for the alleged lack of response to the 2012 attack on U.S. government facilities in Benghazi, Libya. *See*, *e.g.*, Jake Tapper & Dana Bash, *Former Deputy Chief of Mission in Libya: U.S. Military Assets Told to Stand Down*, CNN (May 7, 2013), https://www.cnn.com/2013/05/06/politics/benghazi-whistleblower/index.html.  That attack lasted

far longer than the January 6 riot.  Did their inaction constitute providing "aid" to America's enemies, who were at the time actively killing American officials?  To ask the question is to illustrate the dilemma Plaintiffs' suggestion would create.  Presidents and other government officials must exercise their judgment in determining when and how to respond to crises. It is part of what they are elected to do.  Accordingly, their "inaction" may not serve as the basis for a claim of "engaging" in an insurrection.

President Trump did not "engage" in an insurrection as a matter of law. Thus, Plaintiffs fail to state a claim.

## IV.     Plaintiffs' Claims Are Not Ripe

A final bar to Plaintiffs' claims (to the extent they exist and are cognizable) is that they are not yet ripe. Plaintiffs' claims are brought too early.  First, while Plaintiffs are correct in believing that President Trump *will* likely submit a declaration of candidacy and petition of qualified voters to appear on the Republican primary ballot in Virginia, he has not done so *yet*.  Accordingly, there is no decision regarding President Trump's appearance on the ballot currently before the State Board of Elections.  The action that purportedly injured Plaintiffs has not yet occurred.

Second, the 14th Amendment prohibits individuals from *holding* office, not from being on the ballot for an office under the United States, being nominated for such office, or being elected to such office. U.S. CONST. amend. XIV, § 3. This distinction matters because it speaks directly to when the requirements of Section Three are operative. They are not operative or ripe for challenge until an individual *holds* office; a challenge to ballot access is thus premature.

This distinction makes sense because even if there is a "disability" under Section Three, it may be lifted by a two-thirds vote of each House. *Id.* Thus, even if someone is unquestionably disqualified under Section Three, they may still appear on the ballot and be elected by the people.

Whether they are able to "hold" the office depends on whether Congress "remove[s] such disability." *See generally Smith v. Moore*, 90 Ind. 294, 303 (1883) (describing the distinction between restrictions on being *elected* versus *holding* an office and noting, "[u]nder [Section Three] . . . it has been the constant practice of the Congress of the United States since the Rebellion, to admit persons to seats in that body who were ineligible at the date of the election, but whose disabilities had been subsequently removed."); *Privett v. Bickford*, 26 Kan. 52, 58 (1881) (analogizing to Section Three and concluding that voters can vote for an ineligible candidate who can only take office once his disability is legally removed); *Sublett v. Bedwell*, 47 Miss. 266, 274 (1872) ("The practical interpretation put upon [Section Three] has been, that it is a personal disability to 'hold office,' and if that be removed before the term begins, the election is made good, and the person may take the office.").

The Ninth Circuit's opinion in *Schaefer v. Townsend* further illustrates why this is important. 215 F.3d 1031, 1038 (9th Cir. 2000). *Schaefer* evaluated a California law that required candidates for Congress to satisfy a residency requirement at the time he or she filed his or her nomination papers. As in this case, California's law sought to implement a constitutional requirement, the requirement that a member of the House of Representatives be an inhabitant of the state in which he shall be chosen. U.S. CONST. art. I, § 2, cl. 2. Nevertheless, *Schafer* determined that California's law was unconstitutional because it added qualifications that are not found in the Constitution.

Timing was critical in reaching this conclusion. The Constitution provides that an individual must be an inhabitant of the state "when elected." *Id.* "When elected" is not "when nominated" because nonresident candidates could move into the State and "inhabit" it in the period between nomination and election. *Schaefer*, 215 F.3d at 1037.

26

The timing matters. Seeking to prematurely enforce a constitutional limitation effectively imposes an additional qualification on the office of the President, which is not permitted. *See Schaefer*; *see also U.S. Term Limits, Inc.*, 514 U.S. at 802.

Moreover, the fact that the Constitution expressly and exclusively vests Congress with authority to remove a disability (where one exists)—and provides no role for the states or courts to play in this process—buttresses the conclusion that this is not the appropriate time or place for addressing this issue. The text of the Fourteenth Amendment places no limit or restriction on *when* Congress must exercise its authority to remove a disability. Historical practice shows that Congress can and has exercised this authority at different times and in different ways, ranging from general, prospective amnesty to individualized determinations occurring after an individual was elected.

Allowing—let alone *requiring*—states to disqualify candidates at the ballot access stage limits Congress' freedom of action in contravention of the text of the Constitution. If states bar a candidate from the ballot, then Congress never gets the opportunity to play the role expressly and exclusively assigned to it by the Constitution. This is not and cannot be correct. Plaintiffs' claims are not ripe and should be dismissed.

## V.       Plaintiffs Failed to Properly Serve President Trump

President Trump has not returned a waiver of service—to the contrary, there is no indication that Plaintiffs have ever *requested* that President Trump waive service. *See* Fed.R.Civ.P. 4(d).  Thus, to be effective, service must be made in accordance with Rule 4(e).

Rule 4(e) allows for service either pursuant to state law where the court is located or where service is made, or through personal service.  Virginia law allows for personal service, similar to Federal Rule 4(e)(2), or:

> If such service cannot be effected . . . then by posting a copy of such process at the front door or at such other door as appears to be the main entrance of such place of

abode, provided that not less than 10 days before judgment by default may be entered, the party causing service or his attorney or agent mails to the party served a copy of such process and thereafter files in the office of the clerk of the court a certificate of such mailing.

Va. Code § 8.01-296(2)(b).  Florida law provides:

Service of original process is made by delivering a copy of it to the person to be served with a copy of the complaint, petition, or other initial pleading or paper or by leaving the copies at his or her usual place of abode with any person residing therein who is 15 years of age or older and informing the person of their contents.

Fla. Stat. § 48.031.

Plaintiffs' own filing indicates that they have not properly served President Trump. Plaintiffs' filing indicates only that they mailed a copy of the complaint to Mar-A-Lago.  *See* Proof of Service (ECF No. 22). But Florida does not provide for service by mail and Virginia requires posting prior to mail.  There is no indication that Plaintiffs posted a copy of process at the main entrance of President Trump's abode. That is not sufficient.  *See Sewraz v. Long*, Case No. 3:08-cv-00100, 2012 WL 214085 at *2 (E.D.Va. Jan. 24, 2012) ("[N]othing in [Plaintiff's] affidavit of service indicates that he complied with the requirements of Section 8.01-296(2)(b) of the Code of Virginia by posting service prior to mailing it. [citation omitted] Thus, Plaintiff fails to show proper service . . . .").  Plaintiffs have not properly served President Trump.

## CONCLUSION

For the reasons stated above, Defendant Donald J. Trump requests that the Complaint be dismissed with prejudice.

Dated: October 25, 2023

Respectfully submitted,

/s/ David A. Warrington
David A. Warrington (VSB No. 72293)
Jonathan M. Shaw (VSB No. 98497)
Gary M. Lawkowski (VSB No. 82329)
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: 703.574.1206
Facsimile: 415.520.6593
dwarrington@dhillonlaw.com
jshaw@dhillonlaw.com
glawkowski@dhillonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using

the CM/ECF system, which will send a notification of such filing to all counsel of record in this

action.

Date: October 25, 2023

By: /s/ David A. Warrington
David A. Warrington